# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3657 | **DATE** | 12/19/2003 |
| **CASE TITLE** | Ward vs. Sternes | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Enter Memorandum Opinion and Order.  Claims(3)(a), (b) and (c) and 4(a) are procedurally defaulted.  Claims (2),(3)(d) and 4(b) are denied on the merits.  Petition for writ of habeas corpus is denied.  Case is terminated.

(11)  ■  [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | DEC 22 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form.  Mailed by MD. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 12/19/2003 | |
| | | | | date mailed notice | |
| MD | courtroom deputy's initials | | | MD | |
| | | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
03 DEC 19 AM 4:49
FILED-ED 10
Date/time received in
central Clerk's Office

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| United States of America ex rel. **FLINT WARD**, ) ) ) | |
| Petitioner, ) ) | |
| vs. ) ) | No. 00 C 3657 |
| **JERRY L. STERNES**, Warden, Dixon Correctional Center, ) ) ) ) | Judge Joan H. Lefkow |
| Respondent. ) | |



## MEMORANDUM OPINION AND ORDER

In his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, petitioner Flint Ward[1] ("Ward") challenges his conviction for armed robbery entered in the Circuit Court of Cook County, Illinois. Ward raises the following claims in his habeas petition: (1) the police conducted an illegal search and seizure at his home; (2) the police made him participate in an improper "show-up" identification;[2] (3) ineffective assistance of trial counsel; and (4) the trial court abused its discretion when it denied Ward's motion for a continuance. For the reasons stated herein, the petition is denied in its entirety.

---

[1]The court notes that since filing his petition Ward has been paroled from prison. Nevertheless, that does not affect his action here because petitions filed under § 2254 challenge "the fact or duration of the confinement . . . ." *Williams* v. *Wisconsin*, 336 F.3d 576, 579 (7th Cir. 2003). For a parolee, the 'conditions' of parole *are* the confinement." *Id.* (emphasis in original) ("It is because of these restrictions that parolees remain 'in custody' on their unexpired sentences and thus may initiate a collateral attack while on parole.").

[2]"A show-up occurs when only one suspect is presented to the witness." *Abrams* v. *Barnett*, 121 F.3d 1036, 1040 n.5 (7th Cir. 1996) (internal citations and quotations omitted).

## LEGAL STANDARDS

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this court must deny a petition for a writ of habeas corpus with respect to any claim adjudicated on the merits in the state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." *See* 28 U.S.C. § 2254(d); *Price* v. *Vincent*, __ U.S. __, 123 S. Ct. 1848, 1852 (2003). A state court's decision is contrary to clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." *Williams* v. *Taylor*, 529 U.S. 362, 405 (2000). In order for a state court decision to be considered "unreasonable" under this standard it must be more than incorrect, it must lie "well outside the boundaries of permissible differences of opinion." *Hardaway* v. *Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Schultz* v. *Page,* 313 F.3d 1010, 1015 (7th Cir. 2002) (reasonable state court decision must be at least minimally consistent with the facts and circumstances of the case).

Before reviewing the state courts' decisions, however, the court must determine whether the petitioner fairly presented his federal claims to the state courts, as any claim not presented to the state's highest court is deemed procedurally defaulted. *O'Sullivan* v. *Boerckel*, 526 U.S. 838, 844-45 (1999). Moreover, "[a] federal court will not review a question of federal law decided by a state court if the decision of the state court rests on a state procedural ground that is independent of the federal question and adequate to support the judgment." *Moore* v. *Bryant,*

2

295 F.3d 771, 774 (7th Cir. 2002). A federal court may not grant habeas relief on a defaulted claim unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991); *Anderson* v. *Cowen*, 227 F.3d 893, 899 (7th Cir. 2000).

## FACTS[3]

On December 16 and 27, 1995, respectively, an armed robbery occurred at the Three Stooges Store in Chicago, Illinois. Subsequently, the State charged Ward with one count of armed robbery, one count of armed violence and one count of robbery for the December 16, 1995 incident in 96 CR 868. The State also charged Ward with three counts of armed robbery, three counts of armed violence and three counts of robbery for the December 27, 1995 incident in 96 CR 869. The state court consolidated the cases for trial, and Ward waived his right to a jury trial. (Resp. Ex. K-4, Tr. of Rec., at A-46-48.)

On the trial date, December 23, 1996, the trial court held a suppression hearing on Ward's motions to quash his arrest and suppress the show-up identification. (Resp. Ex. K-4 at A-3-4.) At the suppression hearing, Detective Buglio testified that, on December 27, 1995, he was assigned to a case involving an armed robbery. (*Id.* at A-3-4, A-7.) He, along with his partner as well as an Assistant State's Attorney, interviewed Ward at the 7th District Police Station. (*Id.* at A-5-6.) He understood that all or part of the interview would be introduced by the State in its case against Ward. (*Id.* at A-6-7.) He also spoke with the arresting officers, one

---

[3]Traditionally, the court adopts the state courts' factual determinations unless the petitioner rebuts those determinations by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Todd* v. *Schomig*, 283 F.3d 842, 846 (7th Cir. 2002). Here, because the state courts' decisions do not discuss the relevant facts, the court recites the facts from the trial court transcripts.

of whom he thought was Officer Hansen, as well as the witnesses and victims of the crime. (*Id.* at A-6.) After his conversation with the victims and witnesses, Ward was charged with committing armed robbery on both December 16 and 27, 1995. (*Id.* at A-7.)

Next, Officer Hansen testified as follows: On December 27, 1995, at approximately 4:30 p.m., Officer Hansen went to the store located at 1825 West 59th Street (the Three Stooges Store) to investigate an armed robbery. (*Id.* at A-10, A-15, A-17.) On his arrival, he spoke with Sharon Bynum ("Sharon"), Lisa Bynum ("Lisa") and Mustafa Harb ("Mustafa") as well as two additional witnesses, Linda Conner and Anthony Long ("Long"). (*Id.* at A-18, A-22.) Long told Officer Hansen that he observed Ward run out of the store with a paper bag in his hand. (*Id.* at A-11 -12, A-18.) Long gave Officer Hansen Ward's name and a description of him, also stating that Ward was wearing a three-quarter length jacket with a fur collar. (*Id.* at A-20.) Long also told Officer Hansen that, after he observed Ward run out of the store, Long got into a car with someone else and conducted his own search for Ward. (*Id.* at A-18.) Long told Officer Hansen that he located Ward at 5858 South Artesian, which has a cross address of 2432 West 59th Street (the "Artesian address"). (*Id.* at A-19.) The Artesian address is approximately six blocks from the store. (*Id.* at A-21.) Long also told Officer Hansen where Ward lived. (*Id.* at A-20.)

Officer Hansen and his partner took Long with them to the Artesian address but did not observe Ward there. (*Id.* at A-19.) Officer Hansen also took Long with him to Ward's home, but there was no one there. (*Id.* at A-20.) Officer Hansen then returned Long to the store and conducted his own search for Ward. (*Id.* at A-20-21.) At approximately 5:00 p.m., he saw an individual on the corner of the Artesian address who fit Long's description of Ward (although it is unclear whether Ward was wearing the same jacket that Long described to Officer Hansen). (*Id.* at A-20-21.) He detained Ward but did not place handcuffs on him. (*Id.* at A-12, A-21.)

4

Officer Hansen then brought Ward back to the store. Ward remained in the back of Officer

Hansen's police car. (*Id.* at A-11.) Two witnesses identified Ward in "the rear" of Officer

Hansen's car as the offender. (*Id.* at A-14, A-21.) Officer Hansen then placed Ward under arrest

(*Id.* at A-10, -11, A-21-22.) At no point did Officer Hansen recover a weapon from Ward. (*Id.*

at A-25.)

After Officer Hansen's testimony, defense sought a continuance of the hearing because

two police reports were missing, one of Officer Lewis who created a general offense case report

from the December 27 incident, and the other of Officer Frenzel [phonetic] who did the general

offense case report from the December 16 incident. The prosecutor opposed the motion on the

basis that the December 16 incident was not relevant because it did not lead to the eventual

arrest. The prosecutor also argued that the December 27 report of the crime was not relevant to

the identification issue addressed in the motion. Furthermore, he argued, the officer witness to

the identification had testified and other victim witnesses were available to testify. In reply,

defense counsel argued,

> Judge, I believe that the evidence that I'd be able to bring out would be that there
> is an identification or description which is given that is completely inconsistent
> with the description that this officer says he received.
>
> As well as other witnesses that - - or at least one other witness that was
> interviewed that gave information which is completely different from what you
> heard today.
>
> THE COURT: How is it different?
>
> [DEFENSE COUNSEL]: Well, one witness whose name is not given, says that
> he saw someone - - saw the offender drinking wine just after the incident, or
> sometime after the incident at 5958 South Wood.
>
> I would at least like to bring out from the officer that in talking to these
> witnesses, the same witnesses that this officer just spoke to, there's a whole
> different version of information that was provided.

* * *

[PROSECUTOR]: The question here is what was in the mind of the officer at the time he made the arrest. In this particular case is the information gathered from Antonio Long in particular.

Now he's been thoroughly testified and crossed examined to that. He brought the Defendant back and got an identification. The Defendant was placed under[] arrest.

Whether or not he was drinking wine at some previous time, it's not relevant to this. We - -

THE COURT: The request for continuance is going to be denied at this time.

(*Id.* at A-25-30.)

After this exchange, Detective Buglio was recalled to testify. (*Id.* at A-30.) Ward's counsel asked Detective Buglio if he indicated in his supplemental police report that when the officers arrived at Ward's residence, they placed him under arrest. (*Id.* at A-31.) Detective Buglio responded that, from his independent memory, he did not indicate this information in his report. (*Id.*) When shown the report to refresh his recollection, Detective Buglio verified that that he wrote in his report that the arresting officers arrived at Ward's residence and that was where they took Ward into custody. (*Id.* at A-32-33.) On cross-examination, Detective Buglio testified that the arresting officers related to him that they went to the location that one of the witnesses took them to and that, through the investigation, they learned that location was not the address that Ward provided to the police as his home address. (*Id.* at A-33.) Rather, Detective Buglio testified that he identified in his report that the home address that Ward gave him was 5842 South Artesian. (*Id.* at A-34-35.)

At the conclusion of the suppression hearing, the court denied both motions, stating:

6

. . . [A]s to the motion to suppress the identification, it's been held in the past that show up identifications where a suspect is in the rear seat of an automobile or is being observed by himself, not in a line up, are legal.

They have been held to be probative in the past, and in this case the fact that the Defendant was the only one in the rear seat of the vehicle does not rise to the level to preclude the identification by the witnesses.

So the motion to suppress the identification is going to be denied.

. . . [A]s to the motion to quash arrest and suppress evidence, the Court will initially state[] that the witnesses were credible witnesses. The officers - - Officer Hansen had information at the time he came in contact with the Defendant, that the Defendant may have been involved in [] an arm[ed] robbery.

He had information from a witness giving the - - a description, and I believe the name of the Defendant, and a location where the Defendant lived.

The officer returned to that general area, saw the Defendant. At that time the officer had reasonable grounds to believe that a crime may have been committed and that the Defendant may have committed the crime.

Once again, brief detention[s] have been held to be - - to be legal. In this case the officer took the Defendant in the rear of his squad from 24 hundred - - 2432 West 59th Street to 1825 West 59th Street, approximately 6 blocks. The officer had a right to do that.

At the scene two of the witnesses to the armed robbery identified the Defendant. At that time the officer arrested the Defendant.

The Court finds that the officer did have the right to bring the Defendant for a brief detention to the scene of the occurrence. And once the Defendant was identified by the two witnesses at the scene, and those witnesses['] identifications were corroborated by . . . Anthony Long, that did provide sufficient factual basis for the officers to have probable cause to arrest him.

And so at this time, [the] Court find[s] that the officer did have probable cause to arrest, and the motion is denied.

(*Id.* at A-43-45.)

The court then concluded the suppression hearing. Shortly thereafter, the court began Ward's bench trial. Counsel on both sides waived opening arguments and the State offered the following witness testimony:

Sharon testified that she worked as a cashier at the Three Stooges Store, located at 1825 West 59th Street. (*Id.* at A-49.) On December 16, 1995, on or about 4:45 p.m., Ward, whom she identified in the courtroom, entered the store. (*Id.* at 50-51.) Ward stood at the end of the customer line. When he reached Sharon, Ward pulled out a gun from a paper bag. He set the gun on the counter, pointing it towards Sharon. Sharon testified that Ward told her "to put the money in a bag -- don't say nothing put the money in a bag or he was going to shoot." (*Id.* at A-51-52.) Sharon filled the bag with over $100 from the cash register. (*Id.* at A-51-52.) Ward then backed out of the store. (*Id.* at A-52.) During this whole incident, Ward did not wear anything to cover his face. (*Id.* at A- 55.) After Ward left the store, Sharon informed the store manager, Mustafa, about the robbery. (*Id.* at A-52.)

On December 27, 1995, Sharon was working again as a cashier at the store. (*Id.* at A-52-53.) Besides Sharon, only her 19-year old sister, Lisa, and Mustafa were in the store. (*Id.* at A-53.) Ward, whom Sharon identified again in the courtroom, entered the store, pushed Mustafa onto the counter, and pointed a gun to the back of Mustafa's head. (*Id.* at A-53-54.) Again, Ward did not wear anything to cover his face. (*Id.* at A-55.) Ward threw a paper bag at Sharon and told her to fill it with money from the cash register. (*Id.* at A-54.) After Sharon placed all the money from the cash register into the bag, Ward asked Mustafa where the rest of the money was and, at the same time, pulled the chamber back on the gun. (*Id.*) Mustafa told Ward that he had all the money and Sharon showed Ward the register. (*Id.* at A-54.) Ward then backed up towards the door and ran out just as a customer entered the store. (*Id.* at A-54-55.)

8

Sharon set the store alarm and the police arrived in response to this alarm. (*Id.* at 55.) After the police came, Sharon went to her mother's house, which was a few doors down from the store. (*Id.*) She remained there until Mustafa summoned her back to the store. (*Id.* at A-55-56.) When she returned, she saw Ward, who was in the back seat of a police car. (*Id.* at A-56, 64-65, 67.) Ward had on a black coat but she was not sure if the coat had a collar. (*Id.* at A-56.)

On cross-examination, Sharon testified that the first time she saw Ward was on December 16. (*Id.* at A-58-59.) When asked how she knew to refer to Ward by his first name during her direct examination, she said that she knew his name because of her (unidentified) boyfriend. (*Id.* at A-59.)

After the first robbery, Sharon spoke with "Officer Frinzel."(*Id.*) She described to the officer that the offender was a black male, 35-years old, 6'1" tall and 150 lbs. (*Id.* at A-60.) She also described Ward as wearing a black "skull cap" and having a beard and mustache that was "nappy." (*Id.* at A-61, A-63.) After the second robbery, although Sharon could not remember the name of the officer with whom she spoke, she remembered that she gave the officer a description of the offender. (*Id.* at A-63.) This time, she described the offender as a black male, about 37-years old and 150 lbs. but she could not recall whether she told the officer that the offender was 5'11" tall. (*Id.* at A-64.) She also told the officer that the offender had a beard and mustache that was nappy and that the offender was the same person from the first robbery. (*Id.* at A-64-65.) She further told the officer that she had seen the offender drinking wine at 5958 South Wood. (*Id.* at A-65.)

Sharon further testified that the offender was wearing a black and red "Bulls" coat and a hat. (*Id.* at A-65.) When she identified Ward after the second robbery, he was wearing a black coat but, this time, she testified that the coat had fur around the collar. (*Compare id.* at A-66

9

*with* discussion *supra* page 10, citing A-56.) Moreover, when Sharon saw Ward in the car, she said "Yeah, it looks like him. That's him." (*Id.* at A-67.) When asked whether she "told Detective Buglio that the guy in the car looks like [the offender] because he ha[d] the same facial measures and the beard and mustache are the same[,]" Sharon answered "yes." (*Id.* at A-72.)

Sharon's sister, Lisa, testified. On December 27, 1995, at approximately 2:30 p.m., Lisa was at the Three Stooges Store. (*Id.* at A-73-74.) She looked out the store window and saw a man, whom she identified in the courtroom as Ward, walking back and forth in front of the store. (*Id.* at 74-75.) Subsequently, Ward entered the store, pulled a gun from a paper bag, placed the gun to Mustafa's head, and told Sharon to give him money. (*Id.* at A-76.) Lisa started moving towards the back of the store but Ward saw her and pointed the gun at her. (*Id.* at A-76-77.) She further testified that Ward grabbed Mustafa at the back of his neck, holding Mustafa over the counter and tapping the gun against the back of Mustafa's head. (*Id.* at A-77.) Ward then gave Sharon a bag and told her to put money in the bag. (*Id.*) After Sharon put the money in the bag, Ward pulled the "hammer back on the gun" while it was pointed at the back of Mustafa's head. (*Id.* at A-77-78.) Sharon lifted up the register to show Ward that there was no more money and he backed out of the store. (*Id.* at A-78.)

Lisa testified that she remembered the offender was wearing a black Bulls coat. (*Id.* at A-79.) When she spoke with the police officer, she told the officer that she had thought she had seen the offender drinking wine at a certain location in the neighborhood. She then took the officer to that location but she did not identify the offender there. (*Id.* at A-79-80.) She, however, did identify Ward as the offender when he was in the back of the police car. Ward was wearing a black coat but it did not look like the same coat that he wore during the robbery. (*Id.* at A-80.)

10

On cross-examination, Lisa testified that she was able to view Ward in the back of the police car when the officer shined a flashlight on him. (*Id.* at A-81.) Furthermore, she had given the officer a description of the offender as a black male, about 37-years old, 5'11" tall and 150 lbs. (*Id.* at A-86.) She also told the officer that the offender had a beard and mustache. (*Id.* at A-86-87.)

Mustafa, the manager of Three Stooges Store, testified. (*Id.* at A-88-89.) On December 16, 1995, Mustafa was in the rear of the store when Sharon came to him, "screaming loud" that she had been robbed. (*Id.* at A-89.) Mustafa did not observe the offender that day. (*Id.* at 90.) On December 27, 1995, Mustafa was in the store with Sharon and Lisa. (*Id.*) At approximately 2:30 p.m., a man entered the store, pushed Mustafa down onto the counter and put a gun to the back of his head. (*Id.*) The offender threw Sharon a bag and told her to fill it with money. (*Id.*) Sharon put all the money in the bag and gave it to him but the offender then asked for more money. (*Id.*) As he asked, the offender put the gun towards Mustafa's head again and Sharon picked up the register and showed him that there was no more money. (*Id.*) The offender also checked Mustafa's pockets for money but there was no money there. (*Id.* at A-91.) The offender then started walking backwards. (*Id.*) After the offender walked out of the store, Mustafa "turned around," and followed him outside the store but then stopped after he remembered that the offender had a gun. (*Id.*) Although Mustafa had a chance to look at Ward when the police brought him to the store, he told the police to have Sharon look at him because he did not have a good chance to observe the offender during the robbery. (*Id.* at 92.)

On cross-examination, Mustafa testified that he counts the money and gives the receipts to the store's owner. (*Id.* at A-93.) On December 16, approximately $150 to $175 was taken and, on December 27, approximately $200 was taken from the store. (*Id.* at A-94.)

11

After Mustafa's testimony, the court continued the trial to January 7, 1997, to January 17, 1997 (*Id.* at A-97, B-3.)

On January 17, the parties stipulated to Officer Hansen's testimony from the suppression hearing but agreed to exclude his testimony concerning the conversation with Long, who did not testify. (*Id.* at C-3-4.) The parties further stipulated that, at the time of the arrest, Ward was 6'3" tall and weighed 215 lbs. (*Id.*) The State rested its case and Ward's trial counsel moved for a directed verdict as to all counts. (*Id.* at C-5.) The trial court granted the motion as to the armed violence counts and denied the motion with respect to the armed robbery and robbery counts. (*Id.* at C-8.)

Ward's trial counsel then called Officer Tanya Lewis ("Officer Lewis") (*Id.* at C-8.) On December 27, 1995, she was called to investigate an armed robbery at 1825 West 59th Street. (*Id.* at C-11.) She spoke with Lisa, who told her that the offender was 37-years old, 5'11" tall, and weighed approximately 150 lbs. (*Id.* at C-13.) Lisa also told Officer Lewis that she thought she saw the offender drinking wine behind 5958 South Wood and Officer Lewis took her to that location. (*Id.*) Lisa was unable to identify any of the men there as the offender. (*Id.*) Officer Lewis also spoke with an unidentified individual who said he saw the offender drinking wine on the porch of 5934 South Winchester and that the offender may live there. (*Id.* at C-14.)

Officer Lewis further testified that she would have included in her report whether the witnesses told her that the offender had a beard and/or mustache and her report did not reflect that a witness described the offender as having a beard or mustache. (*Id.*) On cross-examination, Officer Lewis testified that when she took Lisa to the location where she thought she saw the offender drinking wine, there were three or four men there (*id.* at C-17), and Lisa said that none of the men was the offender. (*Id.*) The defense rested.

12

During closing argument, Ward's trial counsel pointed out that when the witnesses identified Ward, Lisa did not say that Ward was the man who drank wine at 59th Street and Wood and Lisa did not give Officer Lewis a description of the offender as having a beard and mustache. (*Id.* at C-19-20.) He also pointed out how the description of the offender for the second robbery did not match Ward's height and weight characteristics and that, at the time that Ward was identified as the offender, he wore a different coat from the Bulls jacket. At one point, Ward's trial counsel stated that there was "[a] clear misidentification." (*Id.* at C-20.) He further pointed out that the police uncovered no physical evidence, including the gun and the proceeds. (*Id.* at C-23.)

After closing arguments, the trial judge concluded that he found Sharon, Lisa and Mustafa to be credible witnesses. (*Id.* at C-32.) He recognized that Sharon had the opportunity to observe the offender during both robberies. (*Id.* at C-34.) Both Lisa and Sharon also identified Ward as the offender. (*Id.*) The trial judge concluded that the State proved Ward's guilt beyond a reasonable doubt and entered judgment on a finding of guilty in both cases. (*Id.* at C-34.)

### PROCEDURAL HISTORY

On March 7, 1997, the trial judge sentenced Ward to concurrent 13-year prison sentences on the armed robbery charges. (*Id.* at D-14-15.) Subsequently, Ward appealed his conviction and was assigned counsel from the Illinois Public Defender's Office. Counsel, however, filed a motion to withdraw under *Anders* v. *California*, 386 U.S. 738 (1967). (Resp. Ex. J, Appellate Court of Illinois, First Judicial District, No. 97-1305, Mot. to Withdraw.) Ward filed a response brief on or about October 27, 1997 (Resp. Ex. B, Appellate Court of Illinois, First Judicial District, No. 97-1305, Def. Resp. to Mot. to Withdraw), followed by a supplemental brief on or

about November 18, 1997. (Resp. Ex. A, Appellate Court of Illinois, First Judicial District, No. 97-1305, Supp. Br. & Argument for Def-Appellant.) The Illinois Appellate Court granted counsel's motion to withdraw and affirmed Ward's conviction on February 3, 1998. (Resp. Ex. C, Appellate Court of Illinois, First Judicial District, No. 96 CR 868, 96 CR 869, Order of Feb. 3, 1998, at 4.) Ward filed a motion for leave to appeal with the Illinois Supreme Court on April 14, 1998 (Resp. Ex. D, Illinois Supreme Court, No. 85336, Pet. for Leave to Appeal), which the court denied on October 6, 1998 (Resp. Ex. E, Illinois Supreme Court, No. 85336, Order of Oct. 6, 1998).

On or about November 9, 1998, Ward filed a *pro-se* post-conviction petition (Resp. Ex. K-2, Circuit Court of the First Judicial Circuit, Cook County, Illinois, No. 96 CR 00868-01, 96 CR 00869-01, at C42-46), which the court summarily dismissed on December 22, 1998. Ward appealed and was assigned counsel from the Illinois Public Defender's Office. Counsel, however, filed a motion to withdraw under *Pennsylvania* v. *Finley*, 481 U.S. 551 (1987). On or about June 14, 1999, Ward filed a response brief. (Resp. Ex. F, Appellate Court of Illinois, First Judicial District, No. 99-1001, Def. Resp. to Mot. to Withdraw.) The Illinois Appellate Court granted counsel's motion to withdraw and affirmed the denial of the post-conviction petition on February 14, 2000. (Resp. Ex. G, Appellate Court of Illinois, First Judicial District, No. 1-99-1001, Order of Feb. 14, 2000, at 2.) Ward filed a motion for leave to appeal on or about March 6, 2000 (Resp. Ex. H, Illinois Supreme Court, No. 89120, Pet. for Leave to Appeal), which the Illinois Supreme Court denied on or about May 31, 2000. (Resp. Ex. I, Illinois Supreme Court, No. 89120, Order of May 31, 2000.) On June 27, 2000, Ward filed the instant habeas petition, which was reassigned to the undersigned on September 9, 2000.

## DISCUSSION

### A.  Claim (1): illegal search and seizure

Ward's first claim, illegal search and seizure, is not cognizable on habeas review.  In *Stone* v. *Powell*, 428 U.S. 465, 494 (1976), the Supreme Court foreclosed habeas review of Fourth Amendment claims where the state court provided a full and fair opportunity to litigate such claims.  Because, as described above, Ward had a full and fair opportunity to litigate his Fourth Amendment claim before the state courts, he is not entitled to habeas relief on this claim.  Thus, the court will deny claim (1).

### B.  Claim (2): improper "show-up" identification

Ward alleges that the show-up identification was unduly suggestive because of the conflicting physical descriptions between the offender and himself, including discrepancies in height, weight and facial hair.  Furthermore, Ward points out that during the show-up identification he had to remain in the police car and the witnesses were able to identify him only after the officer directed a small flashlight inside the car.

Because Ward fairly presented claim (2) on direct appeal, this claim is not procedurally defaulted.  Nevertheless, respondent argues that a claim for a suggestive "show-up" identification is non-cognizable on habeas review given that it concerns a state evidentiary ruling.  This argument, however, is without merit.  *See United States ex rel. Givens* v. *Battle*, No. 02 C 3297, 2002 WL 31109445, at *2 (N.D. Ill. Sept. 20, 2002) (rejecting the respondent's argument that a claim for suggestive identification was non-cognizable on habeas review because the claim implicates a federal constitutional right).  Indeed, as Ward pointed out in his underlying state court filings by citing *Neil* v. *Biggers*, 409 U.S. 188, 196-99 (1972), the

15

Supreme Court has recognized a due process claim for suggestive identification on habeas review. As such, the court reviews Ward's claim on the merits.

"A defendant has a due process right not to be identified prior to trial in a manner that is 'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Cossel* v. *Miller*, 229 F.3d 649, 655 (7th Cir. 2000), quoting *Stovall* v. *Denno*, 388 U.S. 293, 301-02 (1967). "In determining the constitutionality of an identification procedure, [the habeas court] undertake[s] a two-step analysis. As an initial matter, the petitioner bears the burden of demonstrating that the challenged procedure was unduly suggestive." *Abrams* v. *Barnett*, 121 F.3d 1036, 1041 (7th Cir. 1996). As for the second step, the Seventh Circuit has stated:

> An in-court identification that follows an impermissibly suggestive identification is admissible if under the totality of the circumstances the in-court identification was reliable. . . . In determining whether an identification is reliable despite suggestive pre-trial identification procedures, courts look to the "*Biggers'* factors": (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention at the time of the crime, (3) the accuracy of the witness's pre-identification description of the criminal, (4) the level of certainty demonstrated by the witness at the time of the identification, and (5) the length of time between the crime and the identification. When the suggestiveness of an out-of-court identification has been conceded, the government bears the burden of proving by clear and convincing evidence that the in-court identification was based upon observations of the suspect other than at the prior, illegal identification, or, alternatively, of proving that the error complained of was harmless beyond a reasonable doubt.

*Cossel*, 229 F.3d at 655 (internal citations and quotations omitted); *see also Biggers*, 409 U.S. at 199-200.

On direct appeal of this claim, the Illinois Appellate Court determined that a one-man show-up identification is "inherently suggestive" but that, in Ward's case, it was not unduly suggestive given that it occurred near the crime scene shortly after the crime took place, citing, *inter alia, People* v. *McKinley*, 69 Ill. 2d 145, 151, 370 N.E.2d 1040, 1042 (1977) (noting that

one-man show up "was suggestive," but concluding that the identification was reliable enough because the original description was accurate, the in-court identification was "positive," and the confrontation occurred within 30 minutes of the offense and within 4 block of its location). (Resp. Ex. C at 2.) Moreover, the Illinois Appellate Court determined that Sharon observed Ward robbing the store on both occasions and had "ample opportunity to observe him." (*Id.* at 3.) Thus, the Illinois Appellate Court concluded that "there was a sufficient basis for a reliable in-court identification even if the show-up identification were found to be unduly suggestive." (*Id.* at 3.)

Here, the show-up identification may be characterized as unduly suggestive. Sharon and Lisa were able to view Ward only when he was seated in the backseat of the police car with a flashlight shining on him. Given the discrepancies between Ward's and the offender's height and weight, "it was even more important that [the witnesses] view [the suspect] in a manner that revealed his true proportions." *Abrams*, 121 F.3d at 1041-42 (holding that the show-up identification was unduly suggestive because the witnesses gave descriptions that showed the offender was shorter and lighter than the petitioner but the petitioner had to sit behind a table, which obscured his height and weight). Thus, with respect to the Illinois Appellate Court's finding that the show-up identification was not unduly suggestive, Ward's contention that this finding deviated from clearly established federal law is not without merit.

Nonetheless, with respect to the Illinois Appellate Court's finding that Sharon's in-court identification was reliable, the court agrees. Sharon had a clear view of Ward during both robberies, she was able to tell the police that the offender was the same person for both robberies and the show-up identification occurred only a few hours after the second robbery. Based on the totality of the circumstances, "there was not a very substantial likelihood of irreparable

17

misidentification." *Abrams*, 121 F.3d at 1042 (although the show-up identification was unduly suggestive, the witness's in-court identification was reliable in accordance with the *Biggers* factors because, *inter alia*, she had a clear view of the petitioner during the shooting, she gave a detailed description of that shooting, she knew the petitioner and only a few hours passed between the time of the shooting and her viewing of the petitioner) (internal citations and quotations omitted). Thus, the court finds that the Illinois Appellate Court's reasoning that Sharon's in-court identification was reliable was not contrary to nor did it involve an unreasonable application of federal law. As such, the court will deny claim (2) on the merits.

## C.    Claim (3): ineffective assistance of counsel

In his habeas petition, Ward alleges that trial counsel was ineffective because (a) Ward gave trial counsel the name of an individual who fit the description of the person whom Lisa and the other witnesses said they saw drinking wine at a certain location but that trial counsel failed to investigate this matter or bring it to the attention of the State's Attorney, (b) Ward gave trial counsel the names of two women who could verify Ward's whereabouts during the time of the robberies but that trial counsel did not present this evidence, (c) trial counsel did not confer with Ward about his case and did not present any evidence or call any witnesses during trial (ignoring that trial counsel did call Officer Lewis), and (d) trial counsel "did not allow [Ward] to testify at trial on his own behalf." (Pet. ¶ 6.)

With the exception of claim (3)(d), Ward did not fairly present his claims of ineffective assistance of counsel to the state courts. On direct appeal, Ward raised all his claims for the first time in his petition for leave to appeal to the Illinois Supreme Court. On post-conviction review, Ward raised all his claims of ineffective assistance of counsel in his post-conviction petition and on appeal before the Illinois Appellate Court. Ward, however, only raised claim 3(d) in his

18

petition for leave to appeal to the Illinois Supreme Court. Thus, because Ward fairly presented only claim (3)(d) during one full-round of review in the state courts, he procedurally defaulted on claims (3)(a), (b) and (c).

With respect to his procedurally defaulted claims, Ward does not directly address whether he may overcome this default. In his reply brief, however, he proclaims his innocence, even stating a "grave miscarriage of justice" has occurred because an "innocen[t] person has been wrongfully convicted and sent to prison." (Pet. Reply at 4.) The court, therefore, construes Ward's statement as invoking the fundamental miscarriage of justice exception such that he argues he is entitled to habeas review of his procedurally defaulted claims. *See Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992) (noting the miscarriage of justice exception "is concerned with actual as compared to legal innocence").

Here, Ward produces no new evidence that demonstrates his innocence. *See Bell* v. *Pierson*, 267 F.3d 544, 551-52 (7th Cir. 2001) (stating "the petitioner must show that 'it is more likely than not that no reasonable juror would have convicted him in light of . . . new evidence.'"), quoting *Schlup* v. *Delo*, 513 U.S. 298, 337 (1995).[4]  Nevertheless, the court recognizes there may be exceptional cases that meet the fundamental miscarriage of justice exception where a petitioner does not provide new evidence but does provide "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *Schlup*,

---

[4]For example, Ward does not submit affidavits that show what the two women would attest as to his alibi. *See Wright* v. *Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997) ("In the case of an uncalled witness, we have held that at the very least the Ward must submit an affidavit from the uncalled witness stating the testimony he or she would have given had they been called at trial"), citing *United States* v. *Kamel*, 965 F.2d 484, 491 (7th Cir. 1992). Moreover, although Ward states that he provided trial counsel with the name of the offender who fits the description of the person drinking wine outside a certain location, Lisa testified that the person was one and the same as the offender, whom she identified as Ward.

513 U.S. at 316. Plainly, there is no evidence before this court that demonstrates Ward's innocence. As such, Ward does not meet the fundamental miscarriage of justice exception. For these reasons, claims (3)(a), (b), and (c) remain procedurally defaulted.

With respect to claim (3)(d), Ward claims that his counsel denied him the ability to testify in his own defense by preventing him from taking the witness stand. "A criminal defendant has a constitutional right to testify in his own behalf; it is an aspect of his right to defend himself, a right held in *Rock* v. *Arkansas*, 483 U.S. 44, 51-53 . . . (1987), to be implicit in the Fifth, Sixth, and Fourteenth Amendments." *Underwood* v. *Clark*, 939 F.2d 473, 475 (7th Cir. 1991). Nonetheless, a bare bones assertion that trial counsel denied a petitioner the opportunity to testify does not suffice, even when the assertion is made under oath. *Id.* at 476. Rather, "[s]ome greater particularity" and "some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify--to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim." *Id.* Here, Ward offers only the bare bones assertion that his trial counsel denied him his right to testify in his own behalf. Clearly, claim (3)(d) must fail.

**D.    Claim (4): trial court's abuse of discretion**

Ward challenges the trial court's decision to deny a continuance on his trial counsel's motion to quash his arrest and to suppress all subsequent evidence and motion to suppress the identification. Specifically, Ward alleges that during the suppression hearing (a) it was brought to his attention for the first time that he was being charged with two separate robberies and that the robberies would be consolidated into one trial; and (b) his trial counsel moved for a continuance to obtain the police report for the first robbery and to call the witnesses who

prepared the report and that the trial judge's denial of the motion for a continuance prejudiced Ward because there was no opportunity to develop the facts.

Ward did not fairly present claim (4)(a) on direct appeal or post-conviction review and thus this claim is procedurally defaulted.[5] Ward, however, fairly presented claim (4)(b) on direct appeal and thus the court reviews that claim on the merits.

"There are indeed instances in which the failure to grant a continuance may rise to the level of a due process violation." *Padgett* v. *O'Sullivan*, 65 F.3d 72, 75 (7th Cir. 1995). A habeas court, however, must give the trial court broad discretion "on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris* v. *Slappy*, 461 U.S. 1, 11-12 (1983), quoting *Ungar* v. *Sarafite*, 376 U.S. 575, 589 (1964).

> To determine whether the trial court abused its discretion in denying the request for a continuance, thus rendering the trial fundamentally unfair, the court must determine (1) whether due diligence was exercised to secure the availability of the witness; (2) whether the witness would offer substantial favorable testimony; (3) whether the witness is both willing and available to testify; and (4) whether the defendant would be materially prejudiced by the denial of the continuance.

*Gardner* v. *Barnett*, 199 F.3d 915, 920 (7th Cir. 1999).

On Ward's direct appeal, the Illinois Appellate Court stated:

> The trial court denied defense counsel's motion for a continuance in order to obtain two additional police reports. The court, after hearing arguments, including the State's contention that the reports would not support defendant's attempt to quash the arrest, suppress evidence and suppress the identification testimony, denied the motion. No abuse of discretion on the part of the trial court is apparent in the record.

(Resp. Ex. C. at 4.)

---

[5]Moreover, based on its review of the state record, Ward's facts are unsubstantiated.

Here, the court finds that the Illinois Appellate Court properly determined that the trial court did not abuse its discretion. Moreover, any error in denying a continuance was harmless. Ward's counsel requested a continuance so that he could present evidence on the conflicting physical descriptions between Ward and the offender and that some witnesses viewed the offender drinking wine at a certain location. During the trial, he elicited that evidence from Sharon, Lisa and Officer Lewis. With respect to the conflicting physical descriptions, as discussed *supra* pages 16-18, although the show-up identification was unduly suggestive, Sharon made a reliable in-court identification of Ward. As for the person drinking wine, Lisa testified that she believed she saw the offender drinking wine at a certain location but that she was unable to identify the offender when Officer Lewis took her there. Lisa, however, did identify Ward as the offender at the show-up identification and in the courtroom. Thus, had Ward's counsel elicited that evidence during the suppression hearing, it is plainly apparent that this evidence would not have changed the outcome of Ward's case. For these reasons, the court will deny claim (4)(b) on the merits.

## ORDER

Wherefore, the court concludes that Ward is not entitled to habeas relief. Claim (1) is non-cognizable on habeas review. Claims (3)(a), (b) and (c) and (4)(a) are procedurally defaulted. Claims (2), (3)(d) and (4)(b) are denied on the merits. This case is terminated.

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Date: December 19, 2003